# AFFIDAVIT

I, Christopher McGuckin, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent of Homeland Security Investigations and have been since June 20, 2005. I attended and completed the Criminal Investigator Training Program (CITP) and the Immigration and Customs Enforcement Special Agent Training (ICESAT) program at the Federal Law Enforcement Training Center (FLETC) in 2005. I have been assigned to the Denver Office of the Special Agent in Charge since December 2005. I have been involved in multiple types of investigations covering the breadth of HSI's statutory authority, including criminal alien investigations, document and benefit fraud, financial crimes, antiquities and cultural artifact trafficking, narcotics trafficking, and the sexual exploitation of children. In 2008 I attended and completed the Treasury Computer Forensics Training Program (TCFTP) Basic Computer Forensic Evidence Recovery Training (BCERT). I have since greatly expanded my experience and training in digital forensics, to include specialized training in Apple device forensics, mobile forensics, Cellebrite Certified Operator and Physical Analyst (CCO/CCPA), Computer Certified Forensic Computer Examiner (CFCE) and other advanced topics. Since December 2008 I have conducted digital forensic examinations and investigations and supported HSI investigations in Denver and throughout the United States. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A. I have received training and instruction in the field of investigation of child pornography and have had the opportunity to participate in investigations relating to the sexual exploitation of children. As part of my training and experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2. This affidavit is submitted in support of an application for a search warrant for computers and related equipment (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252(a)(2) and (4) and 2252A(a)(2) and (5).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252 and 2252A are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5. This investigation concerns alleged violations of 18 U.S.C. Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors.

6. 18 U.S.C. Sections 2252 and 2252A prohibit a person from knowingly possessing or accessing sexually explicit images (child pornography) with the intent to view them as well as receiving or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (child pornography).

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B to this Affidavit.

8. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

9. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

10. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

11. An item, specifically a cellular telephone, is held in evidence at the HOMELAND SECURITY INVESTIGATIONS (HSI) Computer Forensics Lab in Greenwood Village, Colorado, which was confiscated by staff at a residential reentry center (RRC) after it was discovered that two individuals who were on federal supervised release and living at the RRC were using the item. The item is being held in evidence under case number DE07QT19DE0001. The item is further described as one LG - L158VL cellular telephone, bearing serial number (SN) 808VTXF0766122 and International Mobile Equipment Identity (IMEI) 358 007 087 621 226, hereinafter and in Attachments A and B the "Device."

12. Your Affiant believes there is probable cause to believe that the Device is or contains evidence, fruits, and instrumentalities of violations of 18 U.S.C. Sections 2252 and 2252A. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

13. The Device(s) is currently in the lawful possession of the Homeland Security Investigations (HSI). They came into the HSI's possession in the following way: I received the LG - L158VL cellular telephone from U.S. Probation Officer Walter Vanni on February 15, 2019 at approximately 11:15 AM. The Device had been in Federal Probation's secure property locker since it was confiscated by RRC staff and provided to PO Vanni on December 5, 2018. As further described below, use of the cellular telephone violated the special conditions of supervised release of defendants David Ramon Ahumada, Jr. and August Mussat. Therefore, while your Affiant might already have all necessary authority to examine the Device, your Affiant seeks this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

14. The Device(s) are currently in storage at 5445 DTC Parkway, #600, Greenwood Village, CO 80111. In my training and experience, I know that the Device has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of HSI.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device(s)."

16. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

17. "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

18. Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been

searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

19. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

20. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    C. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    D. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

21. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

    A. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment

of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving the sexual exploitation of children, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: image and video files depicting the sexual exploitation of children, stored communications pertaining to the sexual exploitation of children, and electronic records of the transfer of sexually exploitative via the internet.

G. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

H. A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another

dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

22. *Need to review evidence over time and to maintain entirety of evidence.* Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

24. On January 7, 2019, U.S Probation Officer Walter Vanni provided your Affiant, HSI Special Agent Christopher McGuckin, with information regarding the discovery of child sexual exploitation

material on an LG - L158VL cellular telephone which had been used by two individuals who were on federal supervised release and residing in a residential reentry center at the time they used the phone. PO Vanni requested assistance from HSI in investigating child sexual exploitation material found on the cellular telephone. In addition to discussing the investigation with PO Vanni, I have reviewed assorted documents related to the investigation.

25. On October 11, 2005, David Ramon Ahumada, Jr. was convicted of a violation of Title 18 of the United States Code, Section 2252A(a)(2)(A), *Receiving Visual Depictions that had been Transported in Interstate and Foreign Commerce by Computer, of Minors Engaged in Sexually Explicit Conduct*, and sentenced to 80 months imprisonment and 10 years supervised release in the Western District of Texas. Since serving his term of imprisonment for his offense of conviction, the defendant has been adjudicated guilty of violating his supervised release conditions on two occasions, once in the Western District of Texas and once in the District of Colorado. On July 30, 2018, in conjunction with his most recent supervised release adjudication, the defendant was sentenced to time served and 5 years of supervised release by the Hon. Judge R. Brooke Jackson. The defendant was ordered to abide by his supervised release conditions, which include, but are not limited to, the following special conditions:

    A. You must participate in and successfully complete a sex-offense specific evaluation and/or treatment program as approved by the probation officer. The probation officer will supervise your participation in and compliance with the treatment program. You must comply with all rules and regulations of the treatment program that are specified by the treatment agency and the probation officer. You must pay all or part of the costs of treatment as determined by the probation officer based on your ability to pay.

    B. Your use of computers and Internet access devices will be limited to those you request to use, and which the probation officer authorizes. You must submit your person, and any property, house, residence, vehicle, papers, computer, or other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions.

    C. You must allow the probation officer to install software/hardware designed to monitor computer activities on any computer you are authorized by the probation officer to use. The software may record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software on the computer. You must not attempt to remove, tamper with, reverse engineer, or in any way circumvent the software/hardware.

    D. You must reside in a residential reentry center (RRC) for a period of up to 6 months, to commence upon release from confinement and must follow the rules and regulations of that facility.

26. PO Vanni also learned that another RRC resident, August Mussat, also had access to the Device. Mussat had been convicted on April 13, 2018 of Failure to Register as a Sex Offender in the District of Colorado. The defendant was sentenced to a term of 15 months imprisonment and 5 years supervised release by the Hon. Judge Raymond Moore. As a result of his conviction, the supervised release conditions Mussat was required to follow as of November 13, 2018 included, but were not limited to, the following conditions:

A. You must submit your person, and any property, house, residence, vehicle papers computer or other electronic communications or data storage devices or media, and or affects, to search at any time, with or without a warrant, by any probation officer, with reasonable suspicion, one, concerning a new law violation, of a sexual nature, or two, concerning any violation any condition of supervision, which relates to sexual conduct, sexual activity, or sex offender treatment.

B. You must participate in, a sex offender specific evaluation, and if recommended by the evaluation, you must participate in, fully cooperate with, and successfully complete a sex offender specific treatment program, as approved by the probation officer. The probation officer will supervise your participation in and compliance with the program. You must comply with all rules and regulations of the treatment program, that are specified by the treatment agency, and the probation officer. With respect to the treatment program, said program may include the use of polygraphs, and visual response testing for diagnostic and or therapeutic purposes so long as the program does not use polygraphs as the basis for program failure or termination. The use of plethysmographs is not authorized. You must pay all or any part of the costs of treatment as determine by the probation officer based upon your ability to pay.

C. You must allow the probation officer to install software/hardware designed to monitor computer activities on any computer you are authorized by the probation officer to use. The software may record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software on the computer. You must not attempt to remove, tamper with, reverse engineer, or in any way circumvent the software/hardware.

D. You must reside in a Residential Reentry Center (RRC) to commence upon release from imprisonment and must observe the rules of the facility for a period of up to 180 days with an early discharge at the discretion of the probation officer. In the exercise of the probation officer's discretion, he or she shall be guided by the presence of alternative places for you to live, by your ability to pay for any outside or other residence or place to live, and by your status and compliance with the conditions of supervised release, including but not limited to your compliance with the sex offender treatment condition previously imposed.

27. According to PO Vanni, on December 5, 2018, staff at the Independence House South Federal residential reentry center (RRC) discovered David Ramon Ahumada, Jr., a resident of the facility, accessing an unauthorized LG smartphone during a random house count. RRC staff confiscated the Device, placed it in Airplane Mode, and saw that a google account named davidahumada134@gmail.com and a Facebook account under his name were signed into. While they were inspecting the smart phone's contents, RRC staff also observed that multiple pornographic websites had been visited and discovered a video depicting what appears to be a partially nude, minor female who was rubbing her genitalia

28. On December 5, 2018, PO Vanni responded to the RRC to assume custody of the Device. At that time, Ahumada told PO Vanni that he had been in possession of the LG smartphone since on or about November 11, 2108. (Ahumada originally stated that he had obtained the smartphone from a former RRC resident named Darryl Ferguson but later recanted that fact.) Ahumada admitted to accessing the internet with the smartphone one to two hours daily, including admitting to accessing Porn Hub to view pornography on three to four occasions. Ahumada admitted to accessing

Facebook and accessing an email account he created. Ahumada stated that another resident named August Mussat had access to the smartphone, had a passcode to the smartphone, and that Ahumada had noticed Mussat accessing shopping sites. Ahumada admitted he failed to request authorization from probation and RRC staff to use a smartphone. PO Vanni reported to SA McGuckin that he had seen a video on the Device that matches the description by the RRC staff.

29. PO Vanni filed a petition alleging the following supervised release violations against Ahumada on December 11, 2018: "Failure to Request Use of an Internet Access Device From the Probation Officer and Receive Authorization," "Violation of Law" (for failing to register an email account the defendant had been using consistent with his sex offender registration requirements," "Failure to Reside In/Follow the Rules of the Residential Reentry Center (RRC)" (for violating RRC rules and regulations, to include possession of an unauthorized smartphone and viewing pornography, possession of a second unauthorized cell phone), and "Failure to Comply with the Rules and Restrictions Specified by the Sex Offender Treatment Agency".

30. On December 5, 2018, PO Vanni learned that Mussat provided the LG smartphone password to RRC staff. On that date, Mussat admitted to PO Vanni that he had been accessing the unauthorized LG smartphone from November 24, 2018 to December 5, 2018. He told PO Vanni that Ahumada would show Mussat Youtube videos and listened to music on the smartphone. He admitted to PO Vanni to viewing videos and listening to music on the smartphone once per day for about 30 minutes. Mussat also admitted he failed to request authorization from probation and RRC staff to use a smart phone and failed to install software/hardware to monitor computer activities.

31. PO Vanni filed a petition alleging the following supervised release violations against Mussat on December 11, 2018: "Failure to Receive Authorization to Use a Computer from the Probation Officer and to Install Software/Hardware to Monitor Computer Activities" and "Failure to Reside In/Observe the Rules of the Residential Reentry Center (RRC)" (for violating RRC rules and regulations, to include accessing an unauthorized smartphone).

32. PO Vanni reported to SA McGuckin that he had seen a video on the Device that matches the description by the RRC staff.

33. On February 15, 2019, SA McGuckin assumed possession of the Device and confirmed its characteristics and identifying information.

### INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND POSSESS AND/OR RECEIVE CHILD PORNOGRAPHY

34. Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who possess, receive, or access with intent to view child pornography have a sexual interest in children and in images of children. Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

    A. The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

    B. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority

9

of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on media containing child pornography. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

C. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, and other secure storage locations, such as in a digital or electronic format in a safe, secure, and private environment, including in cloud-based storage online or on their person.

D. The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

E. The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

F. The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

G. Based upon training and experience, your Affiant knows that persons in engaged in the possession of child erotica are also often involved in the possession of child pornography. Likewise, your Affiant knows from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

## CONCLUSION

35. Based on the investigation described above, probable cause exists to believe that inside the Device(s) (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Sections 2252(a)(2) and (4) and 2252A(a)(2) and (5) (described on Attachment B).

36. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/ Christopher McGuckin*
Christopher McGuckin, Special Agent
Homeland Security Investigations

SUBSCRIBED and SWORN before me this  28th  day of   March   2019

_____
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Alecia L. Riewerts, Assistant United States Attorney.